Common-<br>wealth<br>*v.*<br>Sumner.

**370**

## The President and Fellows of HARVARD COLLEGE *versus* REBECCA GORE.

Where a citizen, having lived many years at.W, in the county of M, purchased and furnished a house at B, in the county of S, and afterwards with his family spent his summers at his house in W, where he continued to pay his taxes, and his winters at his house in B, and died while so residing in B, it was held that he was an inhabitant of W, within the meaning of *St.* 1817, *c.* 190, and that the probate of his will might be taken in the county of M.

Whether a probate taken in the county of S would not likewise have been valid, *quære.*

APPEAL from a decree of the judge of probate for the county of Middlesex approving and allowing the last will and testament of Christopher Gore. The reason of the appeal was, that the testator, at the time of his decease, was an inhabitant of and resident in the county of Suffolk, and not an

---

*Harvard College v. Gore.*

inhabitant of or resident in the county of Middlesex, and the jurisdiction for taking the probate of the will belonged exclusively to the judge of probate for the county of Suffolk.

The testator was born in Boston, in the county of Suffolk, in the year 1758, and was a member of his father's family until he became of age, his father being an inhabitant of that town. He entered into and practised the profession of the law in the same place, where he resided constantly until 1791, except that he passed one summer at Waltham in the county of Middlesex. From that year until 1796 he spent his summers in Waltham and his winters in Boston. From 1796 to 1804 he was in England, in a public employment under the government of the United States. On his return to his country in 1804, he passed his winters in Boston and his summers in Waltham until 1814. Within this period he was elected and served as representative for Boston, senator for the county of Suffolk, and governor of the commonwealth. In 1814 he was elected to the senate of the United States by the legislature, and after that time he did not live in Boston at all until 1822 ; having his mansion house in Waltham, to which he returned from Washington ; and from the year 1817 to 1822, not being in public employment, he resided constantly the year round at Waltham. He sold his mansion-house in Boston in 1816. In 1822 he purchased another there, and from that year until his death, which took place at Boston on the 1st of March, 1827, he lived in town and country alternately, winter and summer, removing from the country to town in the month of December, and from town to the country before the 1st of May ; having in each place a house of his own, furnished, and taking with him his servants and equipage, and shutting up the house in which he did not live ; and in the year of his death he did not signify any intention of pursuing a different course. Before the year 1814 he was styled of Boston in deeds and other instruments, and after that period of Waltham, and in his will, written by himself about the 15th of December, 1826, he is styled of Waltham. In 1810 he received a commission as a justice of the peace and *quorum* throughout the commonwealth, in which he was styled of Boston ; and in February 1820 and

1827 he rec eived similar commissions, in which he was styled of Waltham. For five years before 1812 he was taxed in Boston for his poll and personal estate, and not afterwards, but in Waltham.

*W. Prescott*, for the appellants, cited Denisart, *tit. Domicile*; *Holyoke* v. *Haskins, ante, p.* 20; *Bruce* v. *Bruce*, 2 Bos. & Pul. 229, note ; *Somerville* v. *Somerville*, 5 Ves. 750 ; *St.* 1817, *c.* 190, § 1 ; Anc. Charters &c. 204, 205 ; *St.* 1783, *c.* 24, § 16, and *c.* 46, § 1 ; *Makepeace & al.* v. *Lee*, determined at Oct. term 1818 in Middlesex, *post*, 378 ; Toller, 50 ; 4 Burn's Eccles. Law, 231 ; Bac. Abr. *Executors &c., E* ; Com. Dig. *Administrator, B* 5 ; *Hilliard* v. *Cox*, 1 Salk. 37 ; *S. C.* 1 Ld. Raym. 562 ; *S. C.* 12 Mod. 385 ; *Byron's case*, Noy, 54 ; Godolph. 69.

*F. C. Gray, contrà*, cited *Granby* v. *Amherst*, 7 Mass. R. 556 ; *Commonwealth* v. *Walker*, 4 Mass. R. 556 ; *Commonwealth* v. *Swan*, 1 Pick. 194 ; *Putnam* v. *Johnson*, 10 Mass. R. 488 ; *Lincoln* v. *Hapgood*, 11 Mass. R. 353 ; *Williams* v. *Whiting*, ibid. 424 ; *Munroe* v. *Douglas*, 5 Mad. Ch. R. 379 ; *Griffith* v. *Griffith*, Sayer, 83.

372

The opinion of the Court was afterwards drawn up by

PARKER C. J. This is an appeal from a decree of the judge of probate of wills &c. for the county of Middlesex, proving and allowing the last will and testament of Christopher Gore.

The only reason of appeal filed in the probate office, conformably to the statute, is, that at the time of his decease Mr. Gore was an inhabitant of and resident in the city of Boston, n the county of Suffolk, by reason whereof the jurisdiction over the will was in the judge of probate for the county of Suffolk, and not in the judge of probate for the county of Middlesex, so that the decree appealed from is void and of no effect.

This legal conclusion necessarily follows from the fact asserted in the reason filed, for by *St.* 1817, *c.* 190, which prescribes and limits the power and jurisdiction of Probate Courts, it is provided that a Probate Court shall be held within the several counties of the commonwealth, for taking the probate of wills and granting administration on the estates of

persons deceased, "being inhabitants of, or resident in the same county, *at the time of their decease.*"[1]

The fact of habitancy or residence within the county wherein the will is presented for probate, is essential to the jurisdiction of the judge. So that the question turns altogether upon the fact of the habitancy or residence of Mr. Gore at the time of his decease. But this fact is of a complex character and depends upon the application of rules and principles of law to the circumstances, condition and intentions of the testator, all which are to be taken together nto account in determining his habitancy or residence, at the time of his decease ;[2] for a man may have a settled residence or home in one county or town, and yet may, according to the common use of the phrase, live in another, and may die there, and it is clear that the place where he died, or where he may have lived immediately preceding his death, does not fix his domicile or habitancy. In *Somerville* v. *Somerville,* cited from 5 Vesey, the master of the rolls says, " There is not a single dictum, from which it can be supposed, that on a question of domicile the place of the death shall make any difference." In Godolphin, 69, it is said, " Regularly the will is to be proved in the ecclesiastical court of the same county where the testator is an inhabitant, or wherein he made his most usual residence and abode for the later years before his death, and not in the ecclesiastical court of that county wherein he made his will, or wherein he died, but where his last place of habitation was." Here habitation means something different from mere residence ; a dis tinction which we think is adopted by our legislature in the statute under consideration. We think it pretty obvious, that the words *inhabitant* and *resident* were used in the statute *diverso intuitu* and not synonymously, not merely because they are used disjunctively, but because they are words of different capacities and meaning. If it had been intended that residence alone should in all cases give jurisdiction to the Court, the word inhabitant was superfluous ; and if habitancy, in its

---

[1] See Revised Stat. *c.* 64, § 3.
[2] See *Moore* v. *Darrak,* 4 Haggard's Eccl. R 346

technical sense according to our law, was in all cases to be required, then many cases would be excluded from jurisdiction which have been practically cognizable in the Probate Courts, and which it cannot be supposed the legislature intended to leave unprovided for.  Many aliens reside for years within the commonwealth, without becoming inhabitants of any town or county ; for the term inhabitant imports many privileges and duties which aliens cannot enjoy or be subject to ; and yet such persons often make wills which are proved and allowed here, and lawfully, because they are residents in some particular county.  It may well be supposed that the legislature intended to embrace such cases in the statute, and that they had respect, in providing for the probate of wills, to two classes of persons, — citizens, who are necessarily inhabitants of some town and county, and strangers, who can be residents only in some town or county.  We do not mean however to decide that this will might not be proved in the county of Suffolk, as well as in the county of Middlesex, under the terms of the statute, which seem to give an alternative.   The question we are to decide is, whether it may be lawfully proved in the latter county.

374

From the facts proved and admitted we think it perfectly clear, that the testator's domicile was in Boston until the year 1814, or, in the language of the statute, that he was from his birth until that time an inhabitant of that town. That was his *forum originis*, and it was not changed either by act or intention, both of which must concur to produce a change of domicile.  His absence in Europe and his residence in the country, are quite consistent with the continuance of his municipal relation with that town.  His acceptance of office and payment of personal taxes, show that he elected that town as his home.  In the case of *Dr. Munroe*, reported in 5 Mad. Ch. R. 379, the vice-chancellor says, " A domicile cannot be lost by mere abandonment.   It is not to be defeated *animo* merely,[1] but *animo et facto*, and necessarily remains until a subsequent domicile be acquired, unless the party die *in itinere* toward an intended domicile." ` This

---

[1] See *Hallowell* v. *Saco*, 5 Greenl. 143.

qualification of the principle may be doubted, as it seems in a measure inconsistent with the rule, that the act and intention must unite in order to effect a change.

There was then no intention in the testator to cease being an inhabitant of Boston before the year 1814, and therefore he continued an inhabitant. It was said in argument, that the intention is of no importance ; that it cannot be proved, none but the party himself knowing his intention. But it seems manifest from all the cases on domicile, that intention enters essentially into the subject ;[2] and it is as easy to be proved from acts and declarations as in the case of contracts or crimes, in both of which subjects, intention frequently is the most important consideration.

But in the year 1814 the testator broke up his establish ment in Boston, and made Waltham his home, returning to that place from Washington while he was a member of the senate, and when that office expired, living entirely at Wal tham for five years, during all which time he was to all intents and purposes an inhabitant of that town, subject to all lawful contributions, eligible to office, and enjoying the right of suffrage for state, county and town officers there, and nowhere else. It was said in argument, that living in Boston in the month of April, he had a right to vote there for senators in the annual elections. This is gratuitously said. Opinions on that subject have been different ; but if it be true, it would not follow that he was an inhabitant there, except for that political purpose. He certainly could not vote in the election of municipal officers in March, nor of representatives in May.

Here there was an adoption of a new domicile, as well as an abandonment of the old. The *animus et factum* concur, and the *forum novum* is substituted for the *forum originis*. Undoubtedly it was incumbent on the appellees to prove a change of domicile from that which arose from birth, education, business, and civil and political relations, for the burden was upon them ;[1] but this they have done in the most satis-

---

[2] See Story on Conflict of Laws, 42; *Case of James Casey*, 1 Ash nead, 126 ; 2 Kent's Comm. (3d ed ) 430, n. (*d*).

[1] A domicile once acquired remains until a new one is acquired. Story on Conflict of Laws, 47 : 2 Kent's Comm (3d ed.) 430, n. (*d*).

factory manner, according to all the rules which govern the subject. The *onus probandi* is therefore shifted, and it has become the *duty of* the appellants *to* show, according to the same rules, that this second domicile has been intentionally abandoned, and the *forum originis* resumed. For this they rely upon the solitary fact of residence in Boston during the winter from the year 1822 to the time of the testator's death, and especially that he was there dwelling in a house of his own, with his usual establishment of equipage and servants, when he died. It has been shown, we think, that the place of the death alone has no bearing upon the question, and it is certain that the place of birth is equally inconsiderable, except to furnish a presumption or *primâ facie* evidence of domicile, which in this case has been amply rebutted. There is no evidence of any intention to remain in Boston beyond the winter months. On the contrary, the intention to return to the testator's country seat early in the spring, ought to be inferred from the uninterrupted practice for five years before. There is nothing therefore but the residence ; and that for less than half the year, avoiding that period which has been fixed by the legislature as the time of liability for personal taxes within any town.[1] If such a removal can be considered as the *factum* which constitutes one branch of the domicile, there is a total want of the *animus* or intent which constitutes the other branch ; both of which, as has been shown, must concur to produce the effect of a change.

For the foregoing reasons we think, if this question is to be decided by the principles of the law of domicile as recognised by the civil law, or by the courts of chancery in England, in relation to the succession to personal property, the domicile of the testator would be found to be in the county of Middlesex. The case is certainly less strong than that of *Lord Somerville*, reported in 5 Vesey. He was born in Scotland, and was the heir to a great estate. He left the country early and resided principally in England, having a house and domestic establishment in the latter country. He paid an annual visit to his estate in Scotland, to keep up his

[1] See Story on Conflict of Laws, 46.

Harvard
College
v.
Gore.

connexions there, but never expressed any intention to live there permanently. He was nevertheless held to be domiciled in Scotland.

And the case of *Dr. Munroe*, reported in 5 Maddock, is of a similar character. It was a case of great importance, and without doubt was maturely weighed and considered. The doctor had lived many years in India, and acquired there a very large personal property. He was born in Scotland; educated there for his profession as surgeon; went out to India, where he practised his profession and acquired a large fortune; left that country with an intention to return and pass the remainder of his life in Scotland; arrived in England, where he was taken sick, and concluded on that account not to go to Scotland to live. He went there on a visit and died there. By the law of Scotland heirs of the whole blood only succeed to the personal estate, but by the statutes of England, which adopt in this respect the civil law, heirs of the half blood participate in the succession. It was held that his domicile was in India, where the law of England prevails, so that the half blood were admitted to the succession.

**377** But we think that without reference to the law of domicile, the true construction of our own statute will settle the question in the present case. The term inhabitant, as used in our laws and in this statute, means something more than a person having a domicile. It imports citizenship and municipal relations, whereas a man may have a domicile in a country to which he is alien, and where he has no political relations. As if an American citizen should go to London or Paris with an intention to remain there in business for the rest of his life, or if an English or French subject should come here with the same intention, they would respectively acquire a domicile in the country in which they should so live, but would have no political relation except that of local allegiance to such country. An inhabitant, by our constitution and laws, is one who being a citizen dwells or has his home in some particular town, where he has municipal rights and duties, and is subject to particular burdens; and this habitancy may exist or continue notwithstanding an actual residence in another town or another county, provided the absence is not so long

oi of such a nature as to interrupt or destroy the municipal relation previously formed. In England, it is said, there may be two domiciles at the same time, and then the question of birth or death may be important, among other things, in ascertaining the rule of succession ; but by our law a man cannot be an inhabitant of two towns at the same time. The right to vote, eligibility to office, and the liability to taxes in one town, are necessarily exclusive of the same rights and liabilities in all other towns. Showing therefore that the testator was an inhabitant of Waltham, is showing that he was not an inhabitant of Boston, and so far as habitancy is concerned, is confirming the jurisdiction of the court of Middlesex and ousting that of Suffolk.

The counsel for the appellants asserted that there was a domicile of right and a domicile of fact, and that the latter determined the jurisdiction. Admitting this distinction, though we do not find it supported by authorities, the case before us is one where the domicile of either sort exists in the county where the probate was granted.

Upon examination of the cases cited in support of this appeal, we do not find any which militates against our opinion. In that of *Makepeace et al. v. Lee*, the question was as to the legal liability of Lee to pay taxes on his personal property in Newton or Cambridge. He had been an inhabitant of Cambridge, but before the 1st of May, 1815, had leased his house there for a year, removed to Newton, where he boarded with a tenant, and informed the selectmen that he had come to live in that town. He was there on the 1st of May and was taxed there. The lessee of the Cambridge house never occupied it, and Lee returned to Cambridge and took possession of his house again in August of the same year. There is much in the case that looks like evasion and a pretended change of domicile to avoid his taxes, but it was found by the jury, that on the 1st of May, 1815, he was an inhabitant of Newton. Without doubt the intention expressed to the selectmen had an important bearing on the question, and his return to Cambridge was thought to be owing to a change of mind after he had become an inhabitant of Newton. As far as the case goes, it agrees with the

378

principle adopted in this case, namely, that an actual removal into another town with an intention to become an inhabitant, made him one. The case from 1 Salk. 37, would seem, as there reported, to have a contrary bearing, but on recurring to the pleadings in the same case, 2 Salk. 750, and to the same case as reported in Ld. Raymond and 12 Mod. Rep., it is manifest that the reporter mistook the case. He states it to be a case in which an administrator brought assumpsit, to which the defendant pleaded that the *intestate* lived and died in another diocese than that in which the administration was granted, and that for this cause judgment was against the plaintiff. It appears by the authorities above cited, that the plea was that the *debtor* lived in another diocese ; and this difference is all-important. Administration must be granted in the county where there are *bona notabilia*. A debt on simple contract is *bona notabilia* where the debtor resides, and it is immaterial where the intestate lived or died. This has nothing to do with the probate of the will, which must be in the county where the testator died, if that was the place of his abode or domicile.

The case of *Cutts* v. *Haskins*, 9 Mass. R. 547, has been cited by the appellants, in which it was decided, that where a deceased person was at the time of his death an inhabitant of this State, the power of granting administration appertains exclusively to the judge of probate of that county in which the deceased dwelt. There is nothing contradictory to our opinion in this case. The same questions would arise upon the word *dwelt*, as upon the word *inhabitant*, and it will admit of the same construction. And this is a sufficient answer to the argument founded on the 16th section of *St.* 1783, *c.* 24, which requires the executor, within thirty days, to cause the will to be proved in the same county where the deceased person *last dwelt*. The meaning is, taking it in connexion with the other statute, they being *in pari materie*, in the same county of which the deceased person was an *inhabitant*, unless he were a stranger and had only a residence. The constitutional definition of habitancy is the place where a man dwells or has his home ; in other words, his domicile. A narrower construction would give jurisdiction to the judge of the county

where a man happens to die, although on a temporary absence from home. The facts on which the judgment in the case last mentioned was rendered were, that the deceased parties, many years before their decease, removed from Boston to Natick, in the county of Middlesex, and continued until their respective deaths to live in Natick. There they made with their brother one family. *Natick* was their permanent and fixed residence ; and so it was determined that the adminis- tration should have been granted in that county. The prin- ciple of that case is the same as of this. The facts differ, but habitancy or domicile is the ground of decision in both cases, and not mere residence.

There being nothing, as we think, in principle or authority, repugnant to the decree of the judge of probate of Middle- sex proving and allowing the will of Mr. Gore, that decree is affirmed, and the papers and proceedings remitted to that court.